Davis, J.
The plaintiff in error was indicted upon five counts, viz: the first count charged him-with larceny of a certain check for $2,932.50, the second count charged him with embezzlement of a certain certificate of stock for sixty shares of the stock of The Toledo, St. Louis & Western Railroad Company, the third count charged him with embezzlement of- the check described in the first count, the fourth count charged him with embezzlement of money, the proceeds of the check mentioned and described in the first and third counts, and the fifth count charges him with obtaining the check aforesaid by false pretenses. The jury found him guilty under the third count and not guilty as charged in the first, second, fourth and fifth counts.
The following are undisputed facts which led to this indictment and trial. The plaintiff in error was the junior partner of the firm of Lamprecht Bros. &■ Co., who were brokers in Cleveland, dealing in bonds and stocks and having a branch office in Youngstown. In this case, at least, they transacted business on the stock exchange in New York through Laidlaw & Co., a firm of brokers. On the 9th day of January, 1909, one Ralph H. Ellsworth left an order at the Youngstown office of Lamprecht Bros. & Co. to buy for him sixty shares of Toledo, St. Louis Western Railroad Company’s common stock, at a stipulated price, the certificate to be made out in name of Ellsworth and be delivered to him. Ellsworth paid no money on the *38 stock, at that time, but stated, which he afterwards confirmed by letter, that he would be at the office of Lamprecht Bros. & Co. in Cleveland on Satürday, the 16th of January, and pay for the same. Ellsworth’s order to buy was telegraphed to Laidlaw & Co. in New York on same day it was given, January 9th, and it was executed in New York by Laidlaw & Co. on Monday, January 11th, and notice given to Lamprecht Bros. & Co. in Cleveland by telegraph. On the following day, January 12th, Lamprecht Bros. & Co. received a letter from Laidlaw & Co. stating that the stock had been purchased as ordered and that the amount of the purchase together with commission, in the aggregate $2,932.50, they, Laidlaw & Co., had charged to the account of Lamprecht Bros. & Co. On that date, the books of both Laidlaw & Co. and Lamprecht Bros. & Co. agreed in showing a credit balance in favor of Lamprecht Bros. & Co. of $23,491.04 after the said purchase and commission had been charged to the account of Lamprecht Bros. & Co. Following all this, on January 16th,. Ellsworth appeared at the office of Lamprecht Bros. & Co. and presented to the cashier the bill for purchase of the stock and commission, $2,932.50, together with his check therefor. This is the check which the plaintiff in error is charged with embezzling. The cashier stamped the bill “Paid” and having written upon it the words “Stock to follow,” gave it back to Ellsworth, retaining the check. The check was on the same day deposited with others, in the usual course of business, in the Union National Bank of Cleveland, by employes of Lamprecht Bros. & Co. and in the *39 name of that firm. The check was afterwards paid at the bank on which it was drawn. The certificate for the sixty shares of stock so ordered by Ellsworth and so purchased for him by Lamprecht Bros. & Co., was never forwarded by Laidlaw & Co. and it was never in the State of Ohio, so far as appears. Lamprecht Bros. & Co. made an assignment for the benefit of their creditors, February 9, 1909.
Upon the trial of the case, after all the evidence offered and given by either party had been submitted to the jury, and before argument, the defendant, plaintiff in error here, asked the court to charge the jury in writing before argument, the following separate propositions, with others, viz: “There is no evidence in this case showing or tending to show the defendant guilty of the charge of embezzlement, as charged in the third count of the indictment, and I, therefore, direct you to return a verdict of not guilty as to said count.” The court refused to so instruct the jury before argument and afterwards, although again requested to do so, the court again refused to so instruct the jury in the general charge. Thereby the question is brought upon the record whether there is sufficient evidence to warrant a conviction for crime as charged.
It is manifest that at the time when Ellsworth tendered his check to the cashier of Lamprecht Bros. & Co., the order for the purchase of the stock, which he had given just one week before, had been fully carried out except as to the delivery of the stock; and in that particular it remains unexecuted to this day. What were the legal relations and rights *40 of the parties at that time? Ellsworth had paid-nothing, not even a margin, on the purchase. Nevertheless he had such a property right in the stock, whether it had been bought in his name or not, that he could claim it as his own, subject to the lien of the brokers for advances and commissions; for, as it is said upon good authority in 26 Am. & Eng. Ency. of Law (2 ed.), 1057: “The client is the owner of the stock purchased on margin from the time of the purchase, and is entitled to its possession at any time upon demand and payment of the broker’s commissions and the balance due thereon.” Now if this is the law when the broker advances only ninety per cent, of the purchase price when he fills a customer’s order, no valid reason appears to us why it should not be the law when upon the -request of a customer the broker buys the stock for- the latter and advances all of the purchase money. “The ordinary margin paid on opening an account with a broker — that is, in ordering him to buy or sell securities — is ten per cent. The margin may be less than this, or frequently none is advanced, according to the confidence which the broker has in the ability of the client to respond to • ultimate loss. But, whether the broker advance all or only the principal portion o'f the sum invested in the securities, the relation of the parties is unchanged. The fact exists that the broker looks to the principal for- an indemnity upon the entire transaction. * * * Upon the whole, while it must be conceded that there are apparently some incongruous features in the relation, there seems to be neither difficulty nor hardship in, holding that a ■ stock-broker is a *41 pledgee; for,- although it is true that he may advance all or the greater part of the money-embraced in the speculation, if he acts honestly, faithfully and prudently, the entire risk is upon the client, and may be enforced against him as a personal liability, irrespective of the value of the securities which are the subject of transaction. To introduce a different rule would give opportunities for sharp practices and frauds, which the law should not invite.” 1 Dos Passos on StockBrokers & Stock-Exchanges, (2 ed.), 182, 196.
“The broker acts in a threefold relation: first, in purchasing the stock he is an agent; then, in advancing money for the purchase, he becomes a creditor; and, finally, in holding the stock to secure the advances made, he becomes a pledgee of it. It does not matter that the actual possession of the stock was never in the customer. The form of a delivery of the stock to the customer, and a redelivery by him to the broker, would have constituted a strict, formal pledge. But this delivery and re-delivery would leave the parties in precisely the same situation they are in when, waiving this formality, the broker retains the certificates as security for the advance. The contract is in spirit and effect, if not technically and in form, a contract of pledge, and is ’ governed by the law of pledges.” Jones on Pledges (2 ed.), Sec. 496.
It is expressly decided by the New York Court of Appeals, in Content v. Banner, 184 N. Y., 121, that when a stockbroker buys securities for a customer, although he advances the whole amount necessary for the purchase, instead of requiring a margin, the relation of pledgee and pledgor exists *42 between the parties. So that, when Ellsworth presented Lamprecht’s bill, or statement of account, to their cashier together with his check for a corresponding amount, he was not putting up a margin for a future deal, nor putting money into their hands upon a specific trust. Lamprecht Bros. & Co. had paid the whole amount of the purchase and the commission and held the right to the stock in the hands of Laidlaw & Co., subject to the payment of their lien for the amount advanced. From the moment that Ellsworth’s check was accepted and the bill receipted, the stock became, absolutely his very own, and subject to his right to possess and control whether it should be found in the possession of Lamprecht Bros. & Co. or Laidlaw & Co. He-had received a full and valuable consideration for the check and the same had become the lawful property of Lamprecht Bros. & Co. and was not, and could not be, the subject of embezzlement. This view of the legal relations of the parties to this transaction seems to us to be satisfactorily sustained by Richardson v. Shaw, 209 U. S., 365, and note thereon 14 Am. & Eng. Annotated Cases, 986; Markham v. Jaudon, 41 N. Y., 235; Le Marchant v. Moore, 150 N. Y., 209; and Shaefer v. Dickinson, 141 Ill. App., 234.
By a parity of reasoning from the same facts, the plaintiff in error could not have been properly convicted on any of the counts in this indictment, unless it should be on the second count which charges the embezzlement of the stock itself; and as to this two answers are sufficient for our present purpose. First, it does not appear that the stock purchased for Ellsworth was ever in the posses *43 sion of Lamprecht Bros. & Co., or that it was ever •in this state. Second, assuming that it appears, or .can be made to appear, that the plaintiff in error unlawfully converted the stock to his Own use, that does not necessarily mean that he fraudulently so converted' it, within the meaning of the statute. State v. Cunningham, 154 Mo., 162. Further on we shall discuss the evidence upon this subject somewhat.
It seems, therefore, that there is, and can be, no •sufficient answer to the conclusions above, unless the contention is sound, on part of the state, that after the shares of stock were bought, and' paid for by Lamprecht Bros. & Co., the same shares were subsequently and prior to January 16th, when Ellsworth gave his check, sold by Lamprecht Bros. & Co. Of course, and we say “of course” because the law is well settled on that point, the identical Sixty shares of stock purchased for Ellsworth need not be kept on hand to be delivered to him. It is sufficient if sixty shares of stock of the same kind and value be delivered on demand, and a failure to so deliver on demand may amount to an unlawful, and under some circumstances to a fraudulent conversion of the stock. But it must not be overlooked that the plaintiff in error was found not guilty of embezzling the stock and it does not yet appear that the failure of Laidlaw & Co. or Lamprecht Bros. & Co. to deliver the stock on demand by Ellsworth, would constitute embezzlement of the check given by Ellsworth to pay, in legal effect, •what he owed for the stock. It may have been that the fault of non-delivery was not in Lamprecht Bros. & Co., but in Laidlaw.& Co.; or it may have *44 been that Laidlaw & Co., if Ellsworth had pursued his remedies ag'ainst them, may have made delivery or responded in damages. And just here, it may be remarked, the court erred in refusing both before and after argument, to charge the jury as requested upon this subject, and in charging the jury as follows: “It is immaterial in this case what Ellsworth’s redress or rights may be as against Laidlaw & Co., the correspondents of George O. Lamprecht in New York — it is a question here as to the guilt or innocence of this defendant — whether or not this evidence proves to your satisfaction, beyond a reasonable doubt that he is guilty, that is the question.”
But let us see what there is in. the contention by the prosecution that Lamprecht had sold the stock without Ellsworth’s knowledge or consent after it was bought and paid for by Lamprecht and before Ellsworth gave his check. This is the substance of the argument of the attorneys for the state. “Suppose, that without Ellsworth’s knowledge, and while the stock was in the hands of Laidlaw & Co., Lamprecht ordered Laidlaw & Co. to sell the same, which Laidlaw & Co. did; and then suppose that on the T6th day of January, after Ellsworth’s stock had been sold, without his consent, Lamprecht accepted his check, and appropriated it to his own use, what then was the legal relation existing between Lamprecht and Ellsworth? If Lamprecht on the 14th of January sold Ellsworth’s stock, he could not under the circumstances, thereafter maintain an action against Ellsworth for the purchase price, for he had not only violated his trust, but had sold the stock without lawful justification, *45 and besides, had reimbursed himself; nor could Ellsworth have maintained an action against Laid-law & Co., for under the circumstances, they were justified in selling the stock on Lamprecht’s order, an agent having apparent authority. The title to the stock, upon being sold by Laidlaw & Co., became vested in the purchaser thereof, and Ells-worth lost the title thereto, notwithstanding he had had it at one time; so that on January 16th the title to the stock was not vested in Ellsworth, nor was Ellsworth indebted to Lamprecht for the purchase price thereof. We fail to perceive in these circumstances the relation of debtor and creditor. Notwithstanding he had sold Ellsworth’s stock and concealed that fact from him, and that Ellsworth was not indebted to him, Lamprecht accepted Ells-worth’s check and deposited it to his own account in the Union National Bank of Cleveland, on the 16th of January, 1909. On the day preceding its deposit, January 15th, Lamprecht was overdrawn in this bank in the sum of $5,177.51. On the next business day, January 18th, this overdraft had been reduced to $2,889.38. Lamprecht had used Ells-worth’s check 'in reducing it. This, we think, was the embezzlement of the check.”
Without discussing the soundness of this argument, let us see what the record shows about this hypothesis that Lamprecht had the stock sold on' January 14th without Ellsworth’s knowledge or consent. If that is not true, then the whole case of the state fails. The only evidence upon this subject is what appears in the record as “State’s Exhibit D.” This.is a card memorandum showing the transactions of Lamprecht Bros. & Co. in that *46 particular; stock. Similar and separate memoranda were kept of transactions in other stocks. It was kept and made out by one of the witnesses for the state, and it showed from day to day the balances of that stock “long” or “short.” It does not purport to contain any account with Ellsworth or any other customer. All that it does of itself show is that the firm bought, January 11, 1909, 60 shares-of Toledo, St. Louis & Western, balance “long” 60 shares. January 13 bought 100 shares same, balance “long” 160 shares. January 14, sold 150 shares, balance “long” 10 shares. January 16th, sold 100 shares, balance “short” 90 shares. January 18, bought 100 shares, balance “long” 10 shares. February 9, sold 10 shares, balance O.
Now does this exhibit show beyond a reasonable doubt, and it must be with that degree of certainty to convict, that Lamprecht sold Ellsworth’s sixty shares of stock? Surely not. An examination of the record discloses the fact that, for some unexplained reason, Laidlaw & Co. had not, at any date named on that card, delivered to Lamprecht Bros. & Co. the sixty shares bought for Ellsworth, and that in fact it has never been delivered by Laidlaw & Co. Therefore it could not be presumed from this card, without other evidence to that effect, that the sixty shares of Ellsworth stock, which was not bought on margin but was purchased outright for actual delivery, was included in any subsequent sale.'
Moreover, it clearly appears from the testimony that the sale of one hundred and fifty shares of this stock, on January 14th, was what is technically- *47 known as a “short” sale for account of Lamprecht Bros. & Co.' Now “a sale short means a sale of that which the seller has not, but which he expects to buy in at a lower price than that for which he sells.” 25 Am. & Eng. Ency. Law (2 ed.), 1061, citing Appleman v. Fisher, 34 Md., 549; Baldwin v. Flagg, 36 N. J. Eq., 57; White v. Smith, 54 N. Y., 522; Knowlton v. Fitch, 52 N. Y., 288; Hess v. Rau, 95 N. Y., 359; Maxton v. Gheen, 75 Pa. St., 168. “A sale of stock ‘short’ means a sale of stock which the seller does not at the time possess, but which, by the future date or time agreed upon for delivery to the customer under the terms of the contract, the seller must in some way acquire for the purpose of such delivery.” 26 Am. & Eng. Ency. Law (2 ed.), 1060.
So far, therefore, from proving or even justifying an inference, that Ellsworth’s stock was ordered sold by Lamprecht, as assumed by the prosecution, this memorandum card when considered along with the other testimony in the case, not only fails to show that the stock was sold by Lamprecht and appropriated to his own use, but it does conclusively show that the sale, on January 14th, was an independent and lawful transaction on account of Lamprecht Bros. & Co.; and, since this was a sale of stock “short” the presumption would be that the sale did not include Ellsworth’s stock, nor the stock of any other person held in trust by Lamprecht Bros. & Co., because a short sale means a sale of stock which the vendor has not in his possession or under his control, as shown above, a presumption the exact opposite of *48 That indulged on the trial. Therefore the evidential value of the card was totally misconceived by . the courts below and by the jury.
Proceeding upon the assumption that Lamprecht had ordered to be sold the stock bought for Ells-worth, counsel for the state insist that Lamprecht knew that Ellsworth was not indebted to him, and was not paying a debt, yet he took his check and used it to meet his own obligations. We have not discovered in the record any evidence that Lamprecht had any actual or personal knowledge of this transaction before January 16th when the check was delivered. There is . a conflict in the evidence as to his knowledge on that date and several later dates. Ellsworth testifies that he asked Lamprecht on January 16th whether he required the check to be certified and he replied that it was not necessary, etc., and further that he talked with Lamprecht about the delivery of the stock at several times thereafter. Lamprecht testifies in the most positive manner that no conversation between him and Ellsworth occurred on-Jan- . uary- 16th, except perhaps to pass the time of day; . that he did not know then • that Ellsworth had bought or ordered any stock; that he never saw the check until it was produced on the trial; that he . never sold the stock which had been bought for Ells- . worth, nor directed any other person to sell it; that he never knew that it was sold and never had ah • intention of selling it. So far as Lamprecht’s tes- ■ timony relates to the alleged sale, of the Ellsworth stock* it is not contradicted by anything in the •record, save the inference which has been drawn from the memorandum card, Exhibit D, and which *49 for the reasons already stated, appears to us to be altogether unwarranted.
It has been intimated in the brief for the state that such a view - of this case as we entertain is purely technical and tends to defeat justice. The soundness or the justice of our conclusions must be determined by calm and enlightened judgment; but we nevertheless adhere to the humane precept of the law, that a person who is accused of crime is presumed to be innocent until proven to be guilty. It must be conceded that there is cause for irritation here. Ellsworth-paid his money and has never got that which he bought, but that is not sufficient to convict of the crime of embezzlement. Probably in all time there, has. riot been an extensive bank failure without an accompaniment of wrong and hardship, disappointment and bitterness and a clamor for vengeance. The charge of embezzlement is easily and frequently made under such circumstances and although the charge is sometimes difficult of proof, it is still necessary that the scales of justice be held to an even balance, not forgetting the ancient and merciful rule of the common law that it is better that ninety and nine guilty ones should go unpunished than that one innocent person should suffer.
The conclusion at which we have arrived renders it unnecessary for us to consider any of the other assignments of error. Upon the whole record, we are of the opinion that there is not sufficient evidence to sustain a conviction upon the charge that George O. Lamprecht unlawfully and fraudulently embezzled and converted to his own use the check aforesaid and that the court of common pleas erred *50 in refusing to so direct the jury. I am authorized to say that, in the opinion of the Chief Justice and of Judge Shauck and myself, the foregoing considerations would lead to a final judgment and a discharge of the prisoner. The other concurring Judges, however, are of the opinion that the. case should be remanded to the court of common pleas for further proceedings, and, therefore, the judgment of the circuit court and that of the court of common pleas are reversed and the cause remanded.

Reversed.

Spear, C. J., Shauck, Price and Johnson, JJ., concur. Donahue, J., not participating, having sat in the circuit court.