[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 290 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 291 
The ground upon which the plaintiff, before the commencement of this action, sought to repudiate his liability for loss on the sale of the 100 shares of Michigan Southern stock, was that he never authorized the sale or purchase — being too sick at the time to attend to business. The uncontroverted evidence shows that he did authorize the sale through his agent, Lounsberry. The plaintiff's letter of October 5, 1864, construed in connection with the previous dealings between him and the defendants, was a clear authority to Lounsberry to give the order, which he did on the same day, to sell for account of the plaintiff 100 shares of Michigan Southern at 61 3/8 .
It is not pretended that, at the time this order was given, the defendants had any Michigan Southern stock belonging to the plaintiff, or that he had any. The undisputed evidence clearly shows the nature of the transaction, and that it was purely speculative. The plaintiff had been engaged in making what are termed "short sales;" and all his transactions through the defendants were of that character. The nature of these sales has, in the many litigations which have come before the courts concerning them, been frequently proved, and is again explained in the testimony in this case. It is proven to be a sale before purchase, with a view of purchasing at a future time at a lower price. It is evident that, to carry out such a speculation, the stock sold must be temporarily procured by the seller for delivery to the purchaser. The manner in which this had been accomplished, in the course of the previous dealings between the plaintiff and the defendants, is explained in the testimony. The plaintiff did not furnish the stock to deliver, but only margins. The defendants furnished the stock. They sold in the regular way, which is, deliverable the next day, and then borrowed *Page 293 
the stock of other parties to deliver. This evidence is wholly uncontroverted. The profit or loss depended upon whether the stock rose or fell. The plaintiff had the right to direct his brokers at any time to buy in the stock and close the transaction. Until bought in, the brokers remained bound to the persons from whom they had obtained the stock, to return to them an equal number of shares, whatever might be the market price at the time it was demanded. The fact that all the previous dealings between the plaintiff and defendants had been of the character described in the evidence, shows that when he ordered the defendants to sell for his account 100 shares of stock which he did not have, he intended that they should, to use the language of the witness, "keep him short of the stock until a chance to buy in at a lower price;" and that he must have contemplated that they should procure the shares for delivery as they had done on previous occasions.
The idea advanced on the argument that, under such an order to sell, the broker should buy for delivery the next day, is totally inconsistent with the nature of the transaction. Such an operation could scarcely have any result except to give to the brokers a commission on both a purchase and sale at the expense of their principal, without any advantage to him. The whole object of the speculation was to remain short until the market price should fall, and then secure the difference between the sum for which the borrowed shares were sold and the cost of those purchased for return to the lender. The lender was entitled to a return of an equal number of shares, without regard to market price; standing in the same position as if he had kept his stock all the time.
It was proved without contradiction that, according to the usage and the agreement between the parties, if the plaintiff did not keep his margin good the brokers were at liberty to protect themselves when the price rose, so as to make the margin insufficient, the only manner in which the brokers could protect themselves from loss, by reason of a still further rise, was by purchasing a sufficient number of shares to *Page 294 
return those they had borrowed and delivered on the plaintiff's account. This they had the right to do on the failure of the plaintiff to supply the necessary margin. They were not bound to remain liable to return the shares they had obtained for delivery without having in hand sufficient funds of the plaintiff to purchase an equal number of shares to replace those used for delivery.
It was also clearly proved that on the fifth of November the plaintiff's margin was wholly exhausted by the rise of the price of the stock to 75¾ that the defendants notified the plaintiff of the fact, and that, unless furnished with more margin, they would be obliged to buy in for his account; that he furnished no margin and made no reply; that they waited until the fifteenth and then bought in the 100 shares at 73, leaving in their hands a balance of only about seventy-five dollars due to the plaintiff. The plaintiff has no reason to complain of the delay, as it resulted in a saving to him of over two per cent.
The court found, at the trial, that this purchase was not made for or on account of the plaintiff. This finding we think was erroneous, and contrary to the undisputed evidence in the case. The others are dependent upon it. We think it was clearly established by the evidence that the defendants had furnished the shares for the plaintiff in carrying out his order of the fifth of October, and that, when the plaintiff failed to keep his margin good, they had the right to buy in shares to replace those so furnished; and that such purchase was, in legal effect, for account of the plaintiff. We find no evidence in the case tending to prove the contrary.
The only evidence introduced to controvert the allegations of the defendants is that of the statement of the defendant Fitch, to the effect that the delivery of the 100 shares, sold to the purchaser, Brownell, was made by setting them off against 100 shares of the same stock which Brownell had on the fourth of October borrowed of the defendants, and which belonged to one of their customers. The effect of this transaction was precisely the same as if Brownell had returned *Page 295 
the borrowed shares, and they had been immediately redelivered to him in performance of the contract of sale made for account of the plaintiff. The fact that the shares thus used belonged to a customer of the defendants can make no difference to the plaintiff. The result of the transaction was to leave the defendants liable to their customer, as before, to deliver to him an equal number of shares when demanded; the plaintiff being substituted in place of Brownell as the borrower of the shares, and the defendants standing responsible to their customer for the plaintiff instead of for Brownell. Whether or not the defendants were authorized thus to employ the stock of their customer depends upon the arrangements between them, which do not appear in the evidence In the absence of any evidence, it is not to be presumed that the defendants were acting improperly in that respect. That question is not at issue in this case, and is one in which the plaintiff can have no interest or concern. The shares were procured on the responsibility of his brokers for his benefit, and used in his business; and he was bound to provide for replacing them. It does not appear that any advantage could accrue to the defendants from the transaction beyond their commissions; and, so far as the plaintiff is concerned, it is immaterial whether the defendants borrowed the shares from other brokers or employed the shares of their own customer.
So long as these transactions are not prohibited by law, there is no reason for relieving either party from the responsibilities which he incurs by engaging in them.
The judgment should be reversed and a new trial ordered, with costs to abide the event.
All concur, except CHURCH, Ch. J., not voting.
Judgment reversed. *Page 296